29 F.3d 655
 146 L.R.R.M. (BNA) 2897, 308 U.S.App.D.C.
9, 63 USLW 2058,
128 Lab.Cas. P 11,142
 RAILWAY LABOR EXECUTIVES' ASSOCIATION; American Railway and
Airway Supervisors' Association; American Train Dispatchers
Association; Brotherhood of Locomotive Engineers;
Brotherhood of Maintenance of Way Employes; Brotherhood of
Railroad Signalmen; Brotherhood Railway Carmen; Hotel
Employees and Restaurant Employees International Union;
International Association of Machinists and Aerospace
Workers; International Brotherhood of Boilermakers, Iron
Ship Builders, Blacksmiths, Forgers and Helpers;
International Brotherhood of Electrical Workers;
International Brotherhood of Firemen & Oilers;
International Longshoremen's Association; National Marine
Engineers' Beneficial Association; Seafarers International
Union of North America; Sheet Metal Workers' International
Association; Transport Workers Union of America;
Transportation Communications International Union; United
Transportation Union, Appellants,
v.
NATIONAL MEDIATION BOARD, Appellee.
Burlington Northern Railroad Company; National Railway
Labor Conference, Intervenor Defendant-Appellees.
 Nos. 91-5223, 91-5310.
 United States Court of Appeals,
District of Columbia Circuit.
Argued Feb. 9, 1994.
Decided July 19, 1994.
As Amended July 20, 1994*
 
 John O'B. Clarke, Jr., Washington, DC, argued the cause, for appellants. With him on the briefs was L. Pat Wynns, Washington, DC. William Grattan Mahoney, Washington, DC, entered an appearance.
 Edward T. Swaine, Attorney, U.S. Dept. of Justice, Washington, DC, argued the cause, for appellee National Mediation Bd. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., U.S. Dept. of Justice, Eric H. Holder, Jr., U.S. Atty., Barbara C. Biddle, Atty., U.S. Dept. of Justice, Ronald M. Etters, Gen. Counsel, National Mediation Bd., Washington, DC. On the brief, for appellee National Ry. Labor Conference were Richard T. Conway, Ralph J. Moore, Jr. and D. Eugenia Langan, Washington, DC.
 Thomas J. Knapp, Fort Worth, TX, argued the cause, for intervenor Burlington Northern R. Co. With him on the brief were Lawrence M. Stroik, Charles W. Shewmake and Odesa L. Gorman-Stapleton, Fort Worth, TX.
 On the brief for amici curiae Airline Indus. Relations Conference and Regional Airline Ass'n were Robert J. DeLucia, Harry A. Rissetto, Thomas E. Reinert, Jr. and Walter Coleman, Washington, DC.
 Before: MIKVA, Chief Judge, WALD, EDWARDS, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge EDWARDS.
 Concurring opinion filed by Circuit Judge RANDOLPH.
 Dissenting opinion filed by Circuit Judge STEPHEN F. WILLIAMS, with whom Silberman, Ginsburg, and Henderson, Circuit Judges, join.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 Under Section 2, Ninth of the Railway Labor Act ("RLA" or "Act"), the National Mediation Board ("NMB" or "Board") is given very limited authority to investigate representation disputes "among a carrier's employees." See 45 U.S.C. Sec. 152 Ninth (1988). Such investigation is initiated only "upon request of either party to the dispute," and it is clear that a carrier is not a "party" under Section 2, Ninth. Id. Following investigation, the Board certifies "to both parties," and "to the carrier," the employees' designated bargaining agent. Id. Nothing in this statutory provision authorizes the Board to investigate or resolve a representation dispute either sua sponte or pursuant to a petition from a carrier; and for more than fifty years following the enactment of the RLA, the Board acted to address representation disputes only when it received requests from or on behalf of employees.
 
 
 2
 Despite the absence of any statutory authority, the Board announced in 1989 that carriers, as well as the Board itself, could initiate representation proceedings in the wake of railroad mergers and acquisitions, on the theory that such events were likely to precipitate uncertainty as to the proper representation of employees. See Procedures for Handling Representation Issues Resulting from Mergers, Acquisitions or Consolidations in the Railroad Industry, 17 N.M.B. 44 (1989) ("Merger Procedures"). Appellants, a coalition of unions representing railroad employees, challenged the Merger Procedures as an illegal arrogation of authority not conferred by the Act. The District Court dismissed appellants' suit as unreviewable under Switchmen's Union of North America v. NMB, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). On appeal, in an opinion by then-Judge Ruth B. Ginsburg, a divided panel of this court reversed, holding that judicial review was available and that the Board had exceeded its statutory authority. See Railway Labor Executives' Ass'n v. NMB, 988 F.2d 133 (D.C.Cir.1993). Having accepted the Board's suggestion for rehearing en banc, we again reverse.
 
 
 3
 The Supreme Court has made clear both that the Board's authority under Section 2, Ninth is "exclusive" only "[i]f the present dispute falls within Sec. 2, Ninth," General Comm. of Adjustment v. Missouri-Kan.-Tex. R.R., 320 U.S. 323, 336, 64 S.Ct. 146, 152, 88 L.Ed. 76 (1943) (emphasis added), and that the Board's role under Section 2, Ninth is very narrow. See Switchmen's, 320 U.S. at 304, 305, 64 S.Ct. at 98, 99, 88 L.Ed. 61. The Board does not even claim that the terms of Section 2, Ninth support the authority that it asserts, and it can point to no other provision in the RLA giving it the authority to promulgate the Merger Procedures. Instead, the Board would have us presume a delegation of power from Congress absent an express withholding of such power. This comes close to saying that the Board has the power to do whatever it pleases merely by virtue of its existence, a suggestion that we view to be incredible. Because we find that the Board's attempt to expand its jurisdiction has no basis whatsoever in the language of the statute or its legislative history, and because the Board's novel claim of authority is belied by longstanding agency practice, we hold that the Merger Procedures constitute a "gross violation" of Section 2, Ninth.[1]
 
 
 4
 Judicial review is available because the challenged action constitutes a "gross violation" of the Act. Having found such a violation, it is clear that appellants must prevail on the merits. Accordingly, we reverse the judgment of the District Court dismissing appellants' complaint; we remand case number 91-5223 for entry of declaratory and injunctive relief in appellants' favor; and we remand case number 91-5310 for reconsideration in light of the new judgment in case number 91-5223.
 
 I. BACKGROUND
 
 5
 Enacted in 1926, the RLA is a comprehensive statute governing labor relations in the railroad and airline industries. In 1934, Congress amended the Act to create the National Mediation Board, a three-member agency whose primary function is to mediate labor disputes among employees and carriers covered by the RLA. See 45 U.S.C. Sec. 154 (1988). Section 2, Ninth of the Act also endows the Board with limited jurisdiction to investigate representation disputes among employees "upon request of either party to the dispute," and, following such investigation, to certify to the parties and to the carrier the identity of the designated bargaining representative. Id. at Sec. 152 Ninth.
 
 
 6
 For more than fifty years following its creation, the Board unvaryingly conducted representation investigations only at the behest of employees or their representatives. In 1987, however, with no direction from Congress, the Board decided that existing procedures under Section 2, Ninth were "inadequate to provide for a fair and orderly resolution of representation matters put into flux by a merger." Trans World Airlines/Ozark Airlines, 14 N.M.B. 218, 241 (1987). The Board announced its intention to promulgate revised procedures with prospective application for handling representation disputes sparked by mergers, acquisitions and consolidations, and it set forth immediately effective interim procedures which permitted carriers to invoke the Board's jurisdiction in those cases. See id. at 241-42; see also Missouri Pacific Railroad (Union Pacific), 15 N.M.B. 95, 111 (1988) (clarifying that Trans World Airlines/Ozark Airlines "interim procedures were meant to apply to the railroad industry as well as the airline industry"). Thereafter, the Board sought comment from carriers and labor organizations on a draft of the Merger Procedures, and, in November 1989, issued them in final form.
 
 
 7
 The Board purported to rest promulgation of the Merger Procedures on "established authority under Section 2, Ninth, of the Railway Labor Act." 17 N.M.B. at 44. The Board cited no specific language in the statute to support this assertion. Rather, recognizing that mergers[2] may lead to changes in craft or class designations and may result in multiple certifications for the same craft or class of employees, the NMB concluded that expanded investigatory procedures were appropriate in order to further the Board's purported mandate of certifying only unions which represent the "majority of a system-wide class of employees." See id. at 46. Accordingly, the Merger Procedures seek to require carriers to inform the NMB in writing of intent to merge, after which the Board will conduct an investigation to resolve "the status of the certifications on the merged carrier." Id. at 51.
 
 
 8
 The Merger Procedures also contemplate that the Board sua sponte may investigate the status of post-merger certifications. Thus, for example, the Procedures state that it is "the affirmative responsibility of the Board" under the Act to determine the status of its prior certifications. Id. at 47; see also id. at 49 (asserting that the Board retains "flexibility to appropriately investigate and apply its procedures to different situations which may arise in the future"). Moreover, at no time in this litigation has the Board disavowed the appellants' claim that the Procedures seek to empower the Board to investigate a carrier's representation status on its own initiative.
 
 
 9
 Following the issuance of the Merger Procedures, the Railway Labor Executives' Association and eighteen other rail labor unions (collectively, "RLEA") filed this suit in the District Court. RLEA sought both a declaratory judgment that the Board lacked statutory authority to promulgate the Merger Procedures and a permanent injunction against their enforcement. The District Court, relying on Switchmen's, dismissed RLEA's complaint on the ground that the adoption of the Merger Procedures fell "within the unreviewable discretion of the NMB." Railway Labor Executives' Ass'n v. NMB, No. 89-3306, at 7, 1991 WL 420181 (D.D.C. June 10, 1991) (memorandum opinion).[3] A panel majority of this court reversed, concluding that Section 2, Ninth "does not bear the new construction the Board has placed upon it." Railway Labor Executives' Ass'n v. NMB, 988 F.2d at 134. The panel majority held that judicial review was not foreclosed by Switchmen's or Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), because the Merger Procedures constituted a wrongful arrogation of power by the Board in "gross violation" of the RLA. 988 F.2d at 134. The full court thereafter granted the Board's suggestion for rehearing en banc.
 
 
 10
 On appeal, RLEA argues that the plain text and legislative history of Section 2, Ninth compel the conclusion that the Board may not investigate a representation dispute except upon request of the employees involved in the dispute. Because the Merger Procedures seek to authorize representation proceedings at the initiation of the Board or carriers, RLEA contends that the Procedures represent a gross violation of the RLA which may be reviewed by this court. In defense, the Board claims, first, that under Switchmen's, this court is powerless to review the Merger Procedures, and, second, that the Merger Procedures are a permissible interpretation of Section 2, Ninth to which this court owes deference. The Board's support for the latter argument consists largely of the contention that because Section 2, Ninth does not expressly bar the agency from investigating representation disputes in circumstances other than those enumerated, the Board is free to do so. As we explain, our reading of the text and legislative history of Section 2, Ninth accords with that of appellants, and we therefore reverse the judgment of the District Court.
 
 II. ANALYSIS
 
 11
 A. Reviewability of Board Actions Under Section 2, Ninth
 
 1. The General Legal Framework
 
 12
 In Texas & New Orleans Railroad Co. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930), and Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), the Supreme Court established that if the absence of jurisdiction of the federal courts would result in a sacrifice or obliteration of a right that Congress created under the RLA, there would be a compelling inference that the general jurisdiction of the federal courts provides a basis for review. See also Switchmen's, 320 U.S. at 300, 64 S.Ct. at 96-97. Thus, when a statutory command is "explicit and unequivocal," or when Congress has "codifi[ed] ... rules governing ... controversies" or stated "the various principles of agency which were to govern the solution of disputes" under Section 2, Ninth, the federal courts have jurisdiction to enforce the congressional command. General Comm. of Adjustment, 320 U.S. at 335, 64 S.Ct. at 151-52.
 
 
 13
 The Supreme Court was concerned, however, that if general federal jurisdiction were left fully open, the federal courts might unduly interfere with the work of the Board in routine cases involving a mere "application of the principles of collective bargaining and majority rule." Id. at 334, 64 S.Ct. at 151. Thus, in Switchmen's, the Court held that the Board's certification of representatives pursuant to Section 2, Ninth was a function committed exclusively to the NMB and was not judicially reviewable. The Board's role was to "find the fact [of representation] and then cease," and the Court found "plain" congressional intent that "the dispute was to reach its last terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law." Switchmen's, 320 U.S. at 305, 64 S.Ct. at 99.
 
 
 14
 Switchmen's has not been taken to mean, however, that all Board actions which fall within Section 2, Ninth's compass are immunized from judicial review. To the contrary, in accordance with the principles enunciated in Leedom v. Kyne, which relied in part on Switchmen's, federal courts have jurisdiction to review "action[s] taken in excess of delegated powers." Leedom v. Kyne, 358 U.S. at 190, 79 S.Ct. at 184. In Leedom v. Kyne, the Supreme Court held that the district court had jurisdiction to set aside a certification of the National Labor Relations Board ("NLRB") where that agency had refused to poll professional employees before combining them in a bargaining unit with non-professional employees. Rejecting the NLRB's claim that the National Labor Relations Act ("NLRA") foreclosed review, the Court found jurisdiction to review because the NLRB had acted "in excess of its delegated powers and contrary to a specific prohibition in the [NLRA]." Id. at 188, 79 S.Ct. at 184. Section 9(b)(1) of that statute, which provides that the NLRB "shall not" certify a bargaining unit comprising both professional and non-professional employees "unless a majority of such professional employees vote for inclusion" in the unit, id. at 185, 79 S.Ct. at 182 (quoting NLRA), was "clear and mandatory," and its violation was subject to judicial review. Id. at 188, 79 S.Ct. at 184. The Court said that it "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." Id. at 190, 79 S.Ct. at 184.
 
 
 15
 Although Leedom v. Kyne itself dealt with a "shall not" statutory command, its application is not so narrowly limited. As we reasoned in Miami Newspaper Printing Pressmen's Union Local 46 v. McCulloch, 322 F.2d 993, 997 (D.C.Cir.1963) (McGowan, J.), an agency (in that case, the NLRB) could as well exceed its delegated powers by failing to adhere to a specific affirmative command. Thus, we were "unable to read the Court's decision in Leedom v. Kyne as limited to the negatively worded prohibition there involved." See id. The Supreme Court implicitly approved this reasoning in Brotherhood of Railway & Steamship Clerks v. Association for the Benefit of Non-Contract Employees, 380 U.S. 650, 661, 85 S.Ct. 1192, 1198, 14 L.Ed.2d 133 (1965) ["Railway Clerks "], which held that NMB action was reviewable to the extent of insuring that the Board had complied with its affirmative statutory duty to investigate representation disputes. See also Physicians Nat'l House Staff Ass'n v. Fanning, 642 F.2d 492, 496 (D.C.Cir.1980) (en banc ) (agency must violate a specific command), cert. denied, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981). Thus, it is of no moment that Section 2, Ninth does not state that "the Board shall not conduct an investigation except on the request of an employee," so long as we may conclude (as we do) that Section 2, Ninth imposes a clear and mandatory obligation upon the NMB to investigate representation disputes only at the behest of the affected employees. We reject any suggestion in our prior cases that it remains open to question whether Leedom v. Kyne applies only to negative commands.
 
 
 16
 In establishing a framework for review pursuant to Switchmen's and Leedom v. Kyne, recent decisions of the circuit have suggested that "[j]udicial review of NMB decisions is one of the narrowest known to the law," and have held that the "courts have no authority to review NMB certification decisions in the absence of ... a gross violation of the Railway Labor Act." International Ass'n of Machinists v. Trans World Airlines, Inc., 839 F.2d 809, 811 (D.C.Cir.1988), cert. denied, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988); see also Professional Cabin Crew Ass'n v. NMB, 872 F.2d 456, 459 (D.C.Cir.), cert. denied, 493 U.S. 974, 110 S.Ct. 497, 107 L.Ed.2d 500 (1989) (same effect). But these decisions have been premised, as was Switchmen's, on the assumption that the action of the Board fell within the compass of authority delimited by Section 2, Ninth. That is not the case here, for not only do the Merger Procedures constitute a "gross violation" of the Act, but the Board has no threshold jurisdiction to act at all in the absence of a request from the employees involved in a representation dispute.
 
 
 17
 Thus, our prior cases do not tell the whole story. The nonreviewability rule announced in Switchmen's always must be understood in light of the very circumscribed role the Board was thought to play under Section 2, Ninth. As the Supreme Court explained:
 
 
 18
 The Mediation Board makes no 'order.' And its only ultimate finding of fact is the certificate. The function of the Board under Sec. 2, Ninth is more the function of a referee. To this decision of the referee Congress has added a command enforcible by judicial decree. But the 'command' is that 'of the statute, not of the Board.'
 
 
 19
 Id., 320 U.S. at 304, 64 S.Ct. at 98 (citations omitted; emphasis added). The Court continued:
 
 
 20
 Under this Act Congress did not give the Board discretion to take or withhold action, to grant or deny relief. It gave it no enforcement functions. It was to find the fact and then cease. Congress prescribed the command.
 
 
 21
 Id. at 305, 64 S.Ct. at 99. These passages demonstrate that the Board has no freewheeling authority to act as it sees fit with respect to anything denoted a "representation dispute." The Board's authority is exclusive only with respect to the precise matters delimited by Section 2, Ninth. If employees have not sought an "investigation" under Section 2, Ninth, none can be initiated because the statute limits action to cases initiated by "employees."
 
 
 22
 Switchmen's itself--the very case on which the Board relies so heavily for its claim that we lack authority to review the Merger Procedures--thus makes abundantly clear that the Supreme Court crafted a very sweeping rule for a very limited class of cases: While the Board enjoys exceptional latitude when acting within its proper sphere of Section 2, Ninth power, that sphere itself is exceptionally narrow. Viewing Switchmen's in this light, it is difficult to conclude that the Supreme Court intended to insulate from review every action of the Board which arguably involves a question of representation, including those (like the one at bar) that bear absolutely no relationship to "find[ing] the fact" of who employees desire as their representative.[4] Switchmen's, 320 U.S. at 305, 64 S.Ct. at 99; accord America West Airlines, Inc. v. NMB, 986 F.2d 1252, 1256 (9th Cir.1992) (as amended Feb. 26, 1993). In this case, the Merger Procedures present a question of the Board's very jurisdiction--a question that is analytically distinct from and antecedent to the issue of whether the Board has correctly found the "fact" of representation. And as the Supreme Court emphasized, "the administrative remedy is exclusive" only "[i]f the present dispute falls within Sec. 2, Ninth." General Comm. of Adjustment, 320 U.S. at 336, 64 S.Ct. at 152 (emphasis added).
 
 
 23
 2. The Special Case of Jurisdictional Questions
 
 
 24
 As we explain below, we have no doubt that the Merger Procedures constitute a bald and insupportable arrogation of power not conferred by the RLA; as such, the Procedures are reviewable under the traditional Leedom v. Kyne analysis. We pause here, however, to note another theory, urged by appellants, under which the Merger Procedures might be amenable to judicial review.
 
 
 25
 As we have observed in a prior decision, this circuit's law on the reviewability of NMB orders has developed along two tracks. See International Longshoremen's Ass'n v. NMB, 785 F.2d 1098, 1099-1100 (D.C.Cir.1986) (summarizing development of dual lines of authority). The first track holds that Board certification orders ordinarily are unreviewable, unless they fall within the ambit of Leedom v. Kyne. The second track, which had its genesis in two pre-Leedom v. Kyne decisions from the 1950s, holds that the court may review orders in which the Board concludes that it lacks jurisdiction to resolve a representation dispute. See American Air Export & Import Co. v. O'Neill, 221 F.2d 829 (D.C.Cir.1954); Air Line Dispatchers Ass'n v. NMB, 189 F.2d 685 (D.C.Cir.), cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951) ["ALDA "].
 
 
 26
 Appellants urge us to abolish this distinction and to adopt a rule that all matters involving the Board's jurisdiction, not merely refusals of jurisdiction, are reviewable. They point out that those circuits which have squarely confronted the issue have held that threshold questions implicating the Board's jurisdiction to act under Section 2, Ninth fall outside Switchmen's proscription against review. See Delpro Co. v. Brotherhood Ry. Carmen, 676 F.2d 960, 962 (3d Cir.) ("judicial review of NMB decisions concerning its own jurisdictional authority is not barred"), cert. denied, 459 U.S. 989, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982); International Longshoremen's Ass'n v. North Carolina Ports Auth., 463 F.2d 1, 3 (4th Cir.) (issue in Switchmen's "was not one of jurisdiction, but of the validity of a Board ruling on a substantial subject clearly within its authorized field"), cert. denied, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 245 (1972); see also United States v. Feaster, 410 F.2d 1354, 1361-62 (5th Cir.) (suggesting that judicial review of jurisdictional question might be available, but finding issue not ripe), cert. denied, 396 U.S. 962, 90 S.Ct. 427, 24 L.Ed.2d 426 (1969). Each of these cases involved the question whether a particular employer was a "carrier" within the meaning of the Act and thus subject to the Board's jurisdiction.
 
 
 27
 Although we need not resolve this issue conclusively in light of our holding that the Merger Procedures are reviewable under Leedom v. Kyne, on reexamination we find it difficult to support the distinction drawn in our prior cases between Board decisions asserting statutory jurisdiction and those declining to exercise it. Indeed, in endorsing a distinction, ALDA noted that in Switchmen's and its two companion cases, "[t]he question was not as to the power of the Board to resolve the dispute but whether it had done so in an erroneous manner." ALDA, 189 F.2d at 687-88. Under this interpretation ofSwitchmen's, appellants' challenge to the Merger Procedures, which is based not on the substance of any Board certification but on the issue of whether the Board has threshold authority, or jurisdiction, to act in the absence of a request from the employees involved in a representation dispute, could logically be reviewable as well.
 
 
 28
 Although ALDA apparently considered Switchmen's and its companions to have reserved only the question whether a refusal to exercise jurisdiction was reviewable, see 189 F.2d at 688, we do not think Switchmen's must be read so narrowly. An assertion of jurisdiction based on the erroneous belief that authority exists does not materially differ from a refusal to exercise jurisdiction based on the erroneous conclusion that statutory authority is lacking, and Switchmen's may not preclude review of either determination. On this point, the Fifth Circuit has noted that "it might be said that while Switchmen's Union holds that there is no judicial review where the Board has exercised its informed discretion" on a matter related to finding the fact of representation, Switchmen's "does not preclude judicial review of questions of law which bear directly upon the jurisdiction of the Mediation Board." Feaster, 410 F.2d at 1361.
 
 
 29
 We are cognizant that it may not always be a simple task to distinguish between Board actions which implicate the Board's threshold jurisdiction and those which are simply an erroneous exercise of functions legitimately entrusted to the Board's discretion under Section 2, Ninth (and, therefore, are reviewable only under the auspices of Leedom v. Kyne ).[5] Inventive or mischievous litigants no doubt would find ways to characterize as "jurisdictional" a broad range of Board actions, even those that no one reasonably would doubt to be within the compass of the Board's authority under Section 2, Ninth. Because we do not wish to extend such an invitation unnecessarily, we rest on our holding that this case is reviewable under the traditional Leedom v. Kyne analysis and leave for another day a fuller reconciliation of the jurisdiction-exercising versus jurisdiction-declining dichotomy set up in ALDA.
 
 B. Analysis of Section 2, Ninth
 
 30
 The Board does not deny that the Merger Procedures seek to allow both the Board and carriers to initiate representation proceedings under Section 2, Ninth. Nor does the Board deny that in this respect the Merger Procedures are directly at odds with more than fifty years of unbroken practice under Section 2, Ninth. We need look no further than the language of Section 2, Ninth, the structure of the Act, and its legislative history to determine that these proposed procedures are not only unprecedented, but legally insupportable as well. In its defense of the Merger Procedures, the Board offers little more than the argument that we should defer to its construction of Section 2, Ninth. Yet, the Board cannot point to any statutory text or legislative history to support its position. And our analysis leads us to the firm conclusion that Congress left no ambiguity in Section 2, Ninth: the Board may investigate a representation dispute only upon request of the employees involved in the dispute. For the Board to act otherwise is for the Board blatantly to exceed its statutory authority.
 
 1. The Plain Language
 
 31
 Section 2, Ninth of the RLA provides:If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election. The Board shall have access to and have power to make copies of the books and records of the carriers to obtain and utilize such information as may be deemed necessary by it to carry out the purposes and provisions of this paragraph.
 
 
 32
 45 U.S.C. Sec. 152 Ninth (emphasis added).
 
 
 33
 The above language makes perfectly clear that, as used in Section 2, Ninth, the term "parties" includes neither carriers nor the Board itself. Indeed, the Board does not claim otherwise. Because the requisite "dispute" must arise "among a carrier's employees," per the first clause of Section 2, Ninth, the succeeding phrase "upon request of the parties to the dispute " can refer only to those same employees. If Congress had considered carriers to be embraced within "parties to the dispute," the final clause of the first sentence would be entirely superfluous. There would be no need to command the Board to certify the results of the investigation "to both parties" and also to "certify the same to the carrier." See Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) (court's duty in construing statute is "to give effect, if possible, to every word Congress used"); United States v. McGoff, 831 F.2d 1071, 1080 (D.C.Cir.1987) (same).
 
 
 34
 Furthermore, the entire structure of Section 2, Ninth makes it plain that representation investigations and elections are conducted only at the behest and for the specific protection of "employees." The "duty of the Mediation Board" to "investigate" does not arise except "upon request of either party," i.e., "employees." The Mediation Board is only "authorized" to conduct an election in connection with "such an investigation " as is prescribed by Section 2, Ninth. When authorized to act, the Board is instructed to "insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier." An "election" can be conducted only "for the purposes herein indicated," i.e., to resolve a dispute "among a carrier's employees" "upon request of either party to the dispute." And the Board is even given the power to gain access "to the books and records of the carriers," but only to "carry out the purposes and provisions" of Section 2, Ninth.
 
 
 35
 In short, when read with care, it is apparent that, in enacting Section 2, Ninth, Congress was quite precise in defining what it meant by "[d]isputes as to [the] identity of representatives"--the title of Section 2, Ninth--and in codifying rules governing the resolution of such disputes. As the Supreme Court has made clear, such "command[s]" are "enforcible by judicial decree." General Comm. of Adjustment, 320 U.S. at 335, 64 S.Ct. at 152.
 
 
 36
 Reference to other sections of the RLA confirms that Section 2, Ninth does not contemplate action-initiating roles either for the Board or for carriers. Thus, where Congress intended carriers and employees to be treated alike (that is, like "parties") with respect to the resolution of particular disputes, this is made plain in the statute. Section 2, Sixth, for example, provides that "[i]n case of a dispute between a carrier or carriers and its or their employees, arising out of grievances ... it shall be the duty of the designated representative or representatives of such carrier or carriers and of such employees ... to specify a time and place at which [a conference] shall be held...." 45 U.S.C. Sec. 152 Sixth (1988). Similarly, Section 2, Second provides that "[a]ll disputes between a carrier or carriers and its or their employees shall be considered ... in conference between representatives designated" by the carrier and employees. 45 U.S.C. Sec. 152 Second (1988). These sections go far to negate any argument that the term "parties" in Section 2, Ninth should be read to encompass anyone other than the employees mentioned in the first clause of that section.[6]
 
 
 37
 It is also clear that where Congress meant to endow carriers with the right to invoke the Board's jurisdiction, or to authorize the Board to offer its services, it did so explicitly. Thus, Section 5, First provides that "[t]he parties, or either party, to a dispute between an employee or group of employees and a carrier may invoke the services of the Mediation Board in any of the following cases ...," 45 U.S.C. Sec. 155 First (1988), and proceeds to state clearly the circumstances under which the Board's mediation services may be had. Section 5, First also explicitly empowers the Board to assert its jurisdiction sua sponte, providing that "The Mediation Board may proffer its services in case any labor emergency is found by it to exist at any time." Id.
 
 
 38
 The fact that Congress omitted equivalent language in Section 2, Ninth cannot be deemed unintentional or immaterial. Thus, for instance, in Landers v. National Railroad Passenger Corp., 485 U.S. 652, 108 S.Ct. 1440, 99 L.Ed.2d 745 (1988), the Supreme Court said: "That Congress [in the RLA] expressly provided railroad employees with the right to the representative of their choice in Adjustment Board proceedings, but did not do so with regard to any earlier phase of the dispute resolution process, is persuasive evidence " that such a right does not exist at earlier phases. Id. at 656, 108 S.Ct. at 1442 (emphasis added). See also id. at 657, 108 S.Ct. at 1443 (finding "no merit" in contention that right to be represented by minority union "is implicit" in Section 2, Eleventh (c)); INS v. Cardoza-Fonseca, 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)). The inescapable conclusion from the plain language of Section 2, Ninth, therefore, is that Congress intended neither carriers nor the Board to initiate representation proceedings.
 
 
 39
 The crux of the Board's claim in this case is that as Section 2, Ninth does not expressly forbid the Board from asserting jurisdiction over a representation dispute in circumstances other than upon employee request, it should not be prohibited from doing so. But the language of Section 2, Ninth does not admit of this argument. The subordinate clause "upon request of the parties" expresses a limiting condition. Indeed, the entire first sentence of Section 2, Ninth imposes strict limitations on the Board's power. The sentence imposes four significant conditions that must be satisfied as a prelude to the Board's authority to investigate a representation dispute: there must be a dispute; the dispute must relate to representation; it must be among a carrier's employees; and one of the parties to the dispute must request the Board's services in resolving it. See 45 U.S.C. Sec. 152 Ninth. Congress effectively has provided a "who, what, when, and how" laundry list governing the Board's authority. These limitations are utterly inconsistent with the notion that the Board blithely may decide that certain circumstances present such an inherent risk of a representation dispute that the Board may investigate at will.
 
 
 40
 Indeed, as established at oral argument, a finding that the Board may investigate representation disputes sua sponte would have far-reaching implications. Under such a regime, it would make no difference who brought an alleged dispute to the Board's attention--a rail passenger worried about service interruptions in the wake of a merger could write to the Board suggesting that it investigate, even where the merger in fact had created no representation issues (as might be the case if, for example, the same national union represented employees on both the merged and acquiring carriers). Furthermore, the Board's power to meddle in railway labor relations would not be limited to the merger context. The Board could just as well announce, for example, that internal union elections and change of leadership automatically warrant Section 2, Ninth investigations because those events create a possibility of employee dissatisfaction with their certified representative. Yet, the notion that the Board enjoys this sort of power is plainly belied by the tightly confined role Congress assigned to the Board under Section 2, Ninth.
 
 2. Legislative History
 
 41
 When Congress took up the RLA amendments in May 1934, it had before it two versions of what is now Section 2, Ninth from which to choose. The House considered H.R. 7650, a bill prepared by rail labor and introduced by Representative Crosser, alongside H.R. 9689, a similar bill prepared by federal Commissioner of Transportation Joseph B. Eastman and introduced by Representative Rayburn. See Railway Labor Act Amendments: Hearings on H.R. 7650 Before the House Comm. on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 1 (1934) ["H.R. 7650 Hearings "]. The version that Congress rejected specifically treated carriers as a "party" to representation disputes, and thus would have left no question as to the right of carriers to invoke the Board's jurisdiction. The rejected language provided:
 
 
 42
 If any dispute shall arise between a carrier and a group of its employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of the third paragraph of this section, it shall be the duty of the Board of Mediation, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, [the identity of the designated representatives].
 
 
 43
 H.R. 7650, 73d Cong., 2d Sess. (1934) (Section 2, Eighth), reprinted in 1 THE RAILWAY LABOR ACT OF 1926, A LEGISLATIVE HISTORY, at 775 (ABA 1988) [hereinafter 1 RAILWAY LABOR ACT].[7] Congress' refusal to enact language which would have established unequivocally the carriers' right to invoke the Board's jurisdiction is strong evidence that Congress did not intend the Board to have the power to confer that right on its own. Cf. Landers, 485 U.S. at 656 n. 3, 108 S.Ct. at 1442 n. 3 (in finding that a claimed right was not implicit in Section 2, Eleventh, Supreme Court relies on the fact that Congress declined to enact proposed amendment that expressly would have established such right).
 
 
 44
 Section 2, Ninth was no insignificant piece of the 1934 amendments. Rather, as the legislative history makes clear, Congress thought it critical to establish machinery by which employees independently could choose their bargaining representatives. See H.R.REP. NO. 1944, 73d Cong., 2d Sess. 2 (1934), reprinted in 1 RAILWAY LABOR ACT, at 919; see also S.REP. NO. 1065, 73d Cong., 2d Sess., pt. 1, at 2 (1934), reprinted in 1 RAILWAY LABOR ACT, at 821. For while the original legislation enacted in 1926 embodied the principle of free choice of employee representatives, it supplied no procedures to guarantee such choice. Experience had shown that railway management subverted their employees' rights by "disputing the authority of the freely chosen representatives" to represent the employees. See H.R.REP. NO. 1944, at 2; see also SECOND ANNUAL REPORT OF THE NATIONAL MEDIATION BOARD 2-3 (1936) (principal defect of the 1926 Act was failure to provide means to insure employees' "right to select their representatives without influence or coercion from the management"). As the Board itself acknowledged in reflecting on pre-1934 history, "because employers have participated in" employee representation disputes, "bitter conflicts have often been precipitated." FIRST ANNUAL REPORT OF THE NATIONAL MEDIATION BOARD 4 (1935).
 
 
 45
 It would be incongruous to suppose, in light of this demonstrated problem and in light of the fact that H.R. 7650 was rejected, that the Board has some unarticulated, inherent authority to entertain Section 2, Ninth petitions from carriers. By invoking the Board's jurisdiction, a carrier could create a problem where employees saw none to exist or thrust itself into the center of a representation fray and thus attempt to influence the outcome of any subsequent election. For example, if the carrier petitioned for a Section 2, Ninth investigation very shortly after a challenging union began to court employee allegiance, that action could hasten an election and effectively prevent a serious challenge to the incumbent union. The timing of a carrier's invocation easily might signal management's sympathies and thus constitute forbidden "interference, influence, or coercion" over the employees' designation of their representatives. 45 U.S.C. Sec. 152 Third (1988). Such a scheme does not comport with the structure of the Act or with Congress' clearly expressed intent.
 
 
 46
 A closely related concern animating the 1934 amendments was the problem of company unions. Although company-controlled unions were "clearly contrary to the purpose" of the 1926 Act, the practice continued because the Act did not include specific language which would, for example, bar carriers from paying the salaries of employee representatives. H.R.REP. NO. 1944, at 2. The 1934 amendments emphatically were intended to prohibit company unions. See 78 CONG.REC. 11,713-14 (1934) (statement of sponsor Rep. Crosser); id. at 11,715 (statement of Rep. O'Connor). Thus, Section 2, Fourth spells out prohibitions on carrier conduct in some detail, providing, for example, that a carrier shall not "deny or in any way question the right of its employees to join [or] organize ... the labor organization of their choice...." 45 U.S.C. Sec. 152 Fourth (1988). Section 2, Third also expressly prohibits "interference, influence, or coercion by either party over the designation" or choice of representatives by the other. Id. at Sec. 152 Third. The concerns expressed by members of Congress and addressed in Section 2, Third and Fourth point strongly toward the conclusion that carriers were to be screened out of any active role in the representation-selection process, in order to avoid any possible tainting of employees' free choice of representatives. See also International Ass'n of Machinists v. Street, 367 U.S. 740, 759, 81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141 (1961) ("A primary purpose" of the 1934 amendments "was to strengthen the position of the labor organizations vis-a-vis the carriers").
 
 
 47
 The legislative history further suggests that the sua sponte investigation power claimed by the Board is antithetical to congressional intent. Because mediation was considered to be the Board's primary function, Congress sought to delineate the Board's other roles in a manner that would avoid compromising its effectiveness as a mediator. It was for that reason, for example, that both the House and the Senate amended the originally-proposed text of Section 2, Ninth so as to empower the Board to appoint a neutral committee to resolve sensitive representation-related issues. See H.R. 7650 Hearings at 71 ("to have mediation what it ought to be," Board "should have no power of decision save in the interpretation and administration of the law itself") (statement of Samuel E. Winslow, Chairman of Board of Mediation); id. at 40-41 (statement of Commissioner Eastman); S.REP. NO. 1065, 73d Cong., 2d Sess., pt. 1, at 3 (1934), reprinted in 1 THE RAILWAY LABOR ACT, at 822; accord Switchmen's, 320 U.S. at 302-03, 64 S.Ct. at 98 (noting importance of maintaining Board's neutrality). Cf. Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 580, 91 S.Ct. 1731, 1737, 29 L.Ed.2d 187 (1971) (significant concern was expressed during passage of 1926 Act that Board be able to "maintain the confidence of both" labor and management). The Merger Procedures trench on this carefully crafted structural scheme by robbing employees of their prerogative to determine whether and when formal procedures are needed to determine their representation. It takes little imagination to comprehend how quickly the Board could lose the confidence and trust of employees and labor organizations it dragged into unwanted elections. Thus, the Merger Procedures could well undermine the mediation effectiveness that Congress thought critical.
 
 
 48
 Tellingly, the Board cannot point to a single piece of the legislative history (let alone the text of the statute) that even remotely suggests it enjoys the sort of power it has claimed for itself under the Merger Procedures. To the contrary, by all indications, Congress thought the Board's powers were not self-initiating, but were to be triggered by a proper invocation thereof by one of the employee parties to the dispute.[8] See H.R. 7650 Hearings at 71 (Board should be kept "clean and free from everything that has gone on up to the time a dispute is actually brought to it ") (statement of Samuel E. Winslow) (emphasis added); id. at 79 (Board will investigate if representation "controversy is carried to the Board") (statement of George M. Harrison) (emphasis added). Our review of the legislative history thus confirms our reading of the statutory text, and satisfies us that the Merger Procedures represent an unsustainable arrogation of power not conferred by Congress, and a "gross violation" of Section 2, Ninth by any reading of Leedom v. Kyne.[9]
 
 
 49
 C. The Board's Consistent Interpretations and Practice
 
 
 50
 Although we find the language and legislative history dispositive, we briefly review the Board's longstanding interpretation of Section 2, Ninth. We find it telling that only in the last five years of its sixty-year history has the Board claimed that Section 2, Ninth affords it the authority to initiate representation disputes or to permit carriers to do so. The Board fails to point to anything in its pre-Merger Procedures history that so much as hints at the existence of such "latent" authority. As such, the Merger Procedures are much more than a midstream change in course; they are a wholesale attempt to rewrite the statute and history.
 
 
 51
 We note in passing that the mere fact that the Board never before has claimed the authority embodied in the Merger Procedures does not mean that such authority, if granted by Congress, has ceased to exist. See United States v. Morton Salt Co., 338 U.S. 632, 647, 70 S.Ct. 357, 366, 94 L.Ed. 401 (1950). However, our analysis of the statute and the legislative history convinces us that Congress did not confer the powers claimed under Section 2, Ninth, in which case, of course, it goes without saying that the bald assertion of power by the agency cannot legitimize it. See id.
 
 
 52
 From its inception, the Board has understood Section 2, Ninth to screen carriers out of the certification proceedings: "The 1934 amendments give authority to the National Mediation Board to determine the choice of employee representatives without interference by management...." SECOND ANNUAL REPORT OF THE NATIONAL MEDIATION BOARD 3 (1936) (emphasis added). See also FIRST ANNUAL REPORT OF THE NATIONAL MEDIATION BOARD 4 (1935) (Congress deliberately "eliminated [management], as a party, from any such controversy"). The Board, moreover, "has consistently interpreted the second and third general purpose of the act along with section 2, first and third, to exclude the carrier as a party to section 2, ninth, disputes,"[10] THIRTY-EIGHTH ANNUAL REPORT OF THE NATIONAL MEDIATION BOARD 30 (1972), and it has reiterated that view even after promulgating the Merger Procedures. See FIFTY-FIFTH AND FIFTY-SIXTH ANNUAL REPORTS OF THE NATIONAL MEDIATION BOARD 33 (1989-1990) ("Carriers are not a party to representation elections ...").
 
 
 53
 The Annual Reports and published Board decisions are equally telling for what they do not contain, namely, any suggestion that the Board itself has power to initiate a Section 2, Ninth investigation. Rather, the Board's longstanding practice makes it clear that, until recently, there never has been even the slightest confusion over the limited authority of the NMB. See Dana E. Eischen, Representation Disputes and Their Resolution in the Railroad and Airline Industries, in THE RAILWAY LABOR ACT AT FIFTY 29 (1977) (Board, "with rare exceptions, has viewed its own role [under Section 2, Ninth] as narrowly circumscribed"). Regulations that have been in effect since 1947 clearly contemplate that representation investigations will be initiated only by employees or their representatives. See 29 C.F.R. Sec. 1203.2 (1993) (requiring applications for Board services to be in writing and accompanied by signed authorization cards from employees); id. at Sec. 1202.3 (Board shall investigate upon request of the parties). There simply is no suggestion that the Board may investigate under any other circumstances. See generally id. at Secs. 1202.3-1202.8 (1993) (containing no suggestion of power to investigate representation disputes absent request of parties). Compare id. at Sec. 1202.1 (Board "may proffer its [mediation] services" any time it finds a labor emergency).
 
 
 54
 Although we are not legally bound by the Board's past constructions of Section 2, Ninth, it is surely noteworthy that these constructions do not in any way endorse the current position of the Board. For more than fifty years, the Board conducted representation investigations only upon request of employees, and the evidence indicates that the Board never even assumed that it had the authority to act sua sponte or at the request of a carrier.
 
 
 55
 D. The Board's Claim of Implied Authority to Promulgate the Merger Procedures
 
 
 56
 As noted above, it is beyond cavil that "an agency's power is no greater than that delegated to it by Congress." Lyng v. Payne, 476 U.S. 926, 937, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986). The Board errs grossly in suggesting that "the question ... is whether the Act expressly precludes the Board from choosing" to adopt the Merger Procedures. Brief for National Mediation Board at 43. Quite to the contrary, the question is whether the Board's "exercise of quasi-legislative authority" is "rooted in a grant of such power by the Congress and subject to limitations which that body imposes." Chrysler Corp. v. Brown, 441 U.S. 281, 302, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979).
 
 
 57
 Unable to link its assertion of authority to any statutory provision, the Board's position in this case amounts to the bare suggestion that it possesses plenary authority to act within a given area simply because Congress has endowed it with some authority to act in that area. We categorically reject that suggestion. Agencies owe their capacity to act to the delegation of authority, either express or implied, from the legislature. See Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374, 106 S.Ct. 1890, 1901-02, 90 L.Ed.2d 369 (1986) ("an agency literally has no power to act ... unless and until Congress confers power upon it"); American Fin. Servs. Ass'n v. FTC, 767 F.2d 957, 965 (D.C.Cir.1985) ("The extent of [an agency's] powers can be decided only by considering the powers Congress specifically granted it in the light of the statutory language and background.") (citation omitted), cert. denied, 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986). The duty to act under certain carefully defined circumstances simply does not subsume the discretion to act under other, wholly different, circumstances, unless the statute bears such a reading. We cannot conclude, as the Board would have us do, that the fact that the Board is empowered to certify employee representatives in certain limited situations means the Board therefore enjoys such power in every instance in which a question of representation arguably exists. The language of Section 2, Ninth, the structure of the Act, and the legislative history all compel a contrary conclusion.
 
 
 58
 Nor is this a case in which principles of deference to an agency's interpretation come into play. Such deference is warranted only when Congress has left a gap for the agency to fill pursuant to an express or implied "delegation of authority to the agency." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). As we have already explained, "Congress has directly spoken to the precise question at issue" in this case, id. at 842, 104 S.Ct. at 2781, so there is no gap for the agency to fill. The text of Section 2, Ninth is plain; the legislative history and Supreme Court precedent underscore the limited role for carriers and for the Board under that section; and the Board can point to no contrary suggestion anywhere in its sixty-year history.
 
 
 59
 To suggest, as the Board effectively does, that Chevron step two is implicated any time a statute does not expressly negate the existence of a claimed administrative power (i.e. when the statute is not written in "thou shalt not" terms), is both flatly unfaithful to the principles of administrative law outlined above, and refuted by precedent. See, e.g., Natural Resources Defense Council v. Reilly, 983 F.2d 259, 266 (D.C.Cir.1993) (" '[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of Chevron.' ") (quoting Kansas City v. Department of Housing & Urban Dev., 923 F.2d 188, 191-92 (D.C.Cir.1991)) (emphasis added). Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well.
 
 III. CONCLUSION
 
 60
 The judgment of the District Court dismissing RLEA's complaint is hereby reversed. Case number 91-5223 is remanded for entry of declaratory and injunctive relief in favor of appellants; and case number 91-5310 is remanded for reconsideration in light of the new judgment in case number 91-5223.
 
 
 61
 So Ordered.
 
 
 62
 RANDOLPH, Circuit Judge, concurring, with whom MIKVA, Chief Judge, WALD, HARRY T. EDWARDS, and SENTELLE, Circuit Judges, join:
 
 
 63
 Professor Henry M. Hart's celebrated "Dialogue" describes Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), as "too weakly reasoned to have much growing power." HART & WESCHLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 409 (Paul M. Bator et al. eds., 3d ed. 1989). Yet grow it must, by leaps and bounds, to cover this very different case.
 
 
 64
 Years ago we held Switchmen's in one hand and Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), in the other, looked back and forth at the opinions and extrapolated the following: "peek at the merits" and if you see the National Mediation Board committing an "obvious" error in performing its certification duties, an error "gross" enough to constitute defiance of a statutory mandate, then and only then review the Board's action. International Bhd. of Teamsters v. Brotherhood of Ry., Airline & S.S. Clerks, 402 F.2d 196, 205 (D.C.Cir.), cert. denied, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968). In my view, whether the original majority opinion in this case just peeked or whether, as Judge Williams thought in dissent, it threw the door wide open and looked the merits straight in the eye, is beside the point. To ask the questions is to assume, incorrectly, that Switchmen's applies to the case before us.
 
 
 65
 "Generalizations," Justice Douglas wrote for the Court, "as to when judicial review of administrative action may or may not be obtained are of course hazardous." Switchmen's, 320 U.S. at 301, 64 S.Ct. at 97. That was 1943; the hazards are now long gone. Federal courts run little risk in generalizing, as they now often do, that judicial review of agency action is presumptively available. See, e.g., Abbott Labs. v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); Rusk v. Cort, 369 U.S. 367, 379-80, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962); Armstrong v. Bush, 924 F.2d 282, 291 (D.C.Cir.1991). Enactment of the Administrative Procedure Act, and particularly 5 U.S.C. Sec. 704, made it safe to say that judicial review "will not be cut off unless there is a persuasive reason to believe that such was the purpose of Congress." Abbott Labs., 387 U.S. at 140, 87 S.Ct. at 1511. This principle derived from the APA, and not Switchmen's, controls.
 
 
 66
 Not Switchmen's because the Supreme Court's decision and the Court's explanation for it do not speak to the type of Board action at issue here. In Switchmen's, one union sued to set aside the Board's order certifying, pursuant to Sec. 2, Ninth of the Railway Labor Act, 45 U.S.C. Sec. 152 Ninth, a rival union as the authorized collective bargaining agent. The union argued that the Board had misconstrued its authority under the Act with respect to the appropriate bargaining unit. The Board issued its certificate in an adjudication as the APA defines it, that is, an "agency process for the formulation of an order." 5 U.S.C. Sec. 551(7). An inter-union dispute of the sort involved in Switchmen's, the Court said, raised an "explosive problem," a problem Congress--through its silence--left to the Board alone to decide without any "dragging out of the controversy into other tribunals of law." 320 U.S. at 303, 305, 64 S.Ct. at 98, 99. To allow the dispute to fester while it worked its way through the courts would, in other words, tend to defeat the Act's purpose of "prevent[ing], if possible, wasteful strikes and interruptions of interstate commerce." Detroit & Toledo Shore Line R.R. v. United Transp. Union, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). As the Court wrote in the companion case to Switchmen's, "[h]owever wide the range of jurisdictional disputes [between unions] embraced within Sec. 2, Ninth, Congress did not select the courts to resolve them." General Comm. v. Missouri-Kansas-Texas R.R., 320 U.S. 323, 336, 64 S.Ct. 146, 152, 88 L.Ed. 76 (1943) (footnote omitted).
 
 
 67
 In case number 91-5223, however, we are not faced with a feud between rival unions.d The Board has not adjudicated such a jurisdictional dispute. It has not issued a certificate pursuant to Sec. 2, Ninth. There is no "explosive problem," no simmering controversy demanding swift and final settlement. We are asked to review the Board's issuance of the Merger Procedures described in the majority's opinion. These are plainly "rules" within the meaning of the APA--that is, "agency statement[s] of general ... applicability and future effect designed to implement ... policy" (5 U.S.C. Sec. 551(4)). I would therefore follow the analysis in Air Line Dispatchers Ass'n v. National Mediation Board, 189 F.2d 685, 687-89 (D.C.Cir.1951). Switchmen's or not, the APA still controls. Under the APA, there is judicial review unless the statute, by its terms or as judicially interpreted, precludes it. 189 F.2d at 688, citing THE ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 136 (1947). Switchmen's interpreted the Railway Labor Act to bar judicial review of Board adjudications. But that interpretation and the reasons behind it do not reach the Board's rulemaking in this case. In light of the presumption in favor of judicial review and because there is no "clear and convincing evidence," Abbott Labs., 387 U.S. at 141, 87 S.Ct. at 1511 (quoting Rusk, 369 U.S. at 379-80, 82 S.Ct. at 794), that Congress intended to insulate Board rulemaking from judicial scrutiny, the APA gives petitioners the right to a decision on the merits and the APA obligates this court to give it. Air Line Dispatchers Ass'n, 189 F.2d at 689.
 
 
 68
 Why, the dissent nevertheless asks, should Switchmen's not be stretched to insulate Board rulemaking as well as Board adjudications of inter-union disputes? The APA gives the answer. After the APA, judicial review may be "preclude[d]" only "to the extent" a statute so provides. 5 U.S.C. Sec. 701. No statute, certainly not Sec. 2, Ninth of the Railway Labor Act, bars judicial review of Board rulemaking and no court, before or after enactment of the APA, has ever ruled otherwise. According to the Attorney General's Manual, the concept embodied in the APA's "to the extent" (or, as it then read, "so far as") clause is "a most important principle of construction"; it is a principle intended to recognize that statutes do not always bar "judicial review altogether" and it is a principle the dissent completely disregards. Manual at 95; see also III KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE Sec. 17.8, at 153-58 (1994). The Attorney General's Manual illustrates the point with a case in which a fired federal employee cannot challenge the agency's judgment to remove him from office, but can obtain judicial review of the question whether the agency followed the required procedures. Id. Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), supplies a more contemporary example. Although United States v. Erika, Inc., 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), held that under Part B of the Medicare program, computations of awards are not subject to judicial review, Michigan Academy held that regulations governing how the awards are computed are reviewable. Switchmen's is to Erika as this case is to Michigan Academy. Unlike most other agencies, the National Mediation Board's exercise of adjudicatory authority is generally immune from judicial scrutiny, but like other agencies its exercise of rule-making power is not.
 
 
 69
 As to the merits, I fully agree with the majority's well-reasoned decision that the Merger Procedures are contrary to the Act.
 
 
 70
 STEPHEN F. WILLIAMS, Circuit Judge, dissenting:
 
 
 71
 Congress provided in the Railway Labor Act that if a "dispute shall arise among a carrier's employees as to who are the representatives of such employees ..., it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify ... the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute...." Railway Labor Act, Sec. 2 Ninth, 45 U.S.C. Sec. 152 Ninth (emphasis added). From this explicit duty, the court infers not merely the absence of any duty to investigate representation disputes sua sponte (a clearly valid reading), but the absence of any Board authority ever to do so. Accordingly the court invalidates procedures that the Board established to address conflicting representational claims arising from mergers of carriers under the Board's jurisdiction. Procedures for Handling Representation Issues Resulting from Mergers, Acquisitions or Consolidations in the Railroad Industry, 17 NMB 44 (1989) (the "Merger Procedures").
 
 
 72
 With admirable candor, the court explicitly discards the model of highly deferential review laid down by the Supreme Court for Board decisions, see Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), and Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), and adopts the view that the Administrative Procedure Act overturns the Switchmen's/Leedom approach and substitutes conventional review of agency action--at least where the Board's action takes the form of a rulemaking. See Concurring Op. at 671-73; Maj.Op. at 659 n. 1 (adopting view of concurring opinion). This distinction between rulemaking and adjudication evidently drives the outcome, for the court explicitly invalidates the Board's rules, Maj.Op. at 671, and merely remands its adjudication applying those rules, id.
 
 
 73
 In the alternative, the majority characterizes the issue--the propriety of the Board's exercising its investigatory and certification power without a request by an employee or union--as jurisdictional, and suggests that this feature may render Switchmen's/ Leedom completely inapplicable. Maj.Op. at 663-664.
 
 
 74
 Finally, the court purports to apply the Switchmen's/ Leedom mode of analysis, and declares the Board's rule a "gross violation" of the Act, Maj.Op. at 669, though in fact giving the Board no more deference--and probably less--than is prescribed by Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), for conventional review of agency decisions.
 
 
 75
 Neither of the court's two theories for displacing Switchmen's/ Leedom--the APA or the characterization of the issue as jurisdictional--appears convincing. Considered with the exceptional deference that those cases require, the Merger Procedures easily pass muster. I dissent.
 
 1. The APA
 
 76
 Any idea that the APA completely sweeps Switchmen's aside is quite inconsistent with the language of that decision and of the APA, with the history of the APA, and with post-APA decisions. The Supreme Court framed the Switchmen's decision as one of statutory interpretation, finding that Congress had precluded judicial review except in narrowly and expressly prescribed instances. "Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate." 320 U.S. at 302, 64 S.Ct. at 98. Not surprisingly, we have found that the APA did nothing to change that result, noting that Sec. 10 of the APA is expressly inapplicable where "statutes preclude judicial review", 5 U.S.C. Sec. 701(a)(1). American Air Export & Import Co. v. O'Neill, 221 F.2d 829, 830 (D.C.Cir.1954); but cf. Air Line Dispatchers Ass'n v. NMB, 189 F.2d 685, 689 (D.C.Cir.1951). The Attorney General's Manual on the Administrative Procedure Act (1947), the APA's primary legislative history, cites Switchmen's as a sample "interpretation of a statute [ ] intended to preclude judicial review although the statute does not expressly so provide", id. at 94, thus locating NMB decisions--at least to the degree covered by Switchmen's--squarely in the category classified as unreviewable under the APA. And since enactment of the APA the Court itself has summarized Switchmen's in virtually the language of the APA exception, describing it as a case holding "that the Act precluded review of the Board's certification of a collective bargaining representative under Sec. 2, Ninth." Brotherhood of Railway & S.S. Clerks v. Association for the Benefit of Non-Contract Employees ("Railway Clerks "), 380 U.S. 650, 658, 85 S.Ct. 1192, 1196, 14 L.Ed.2d 133 (1965).
 
 
 77
 The concurring opinion (and the majority) would evidently distinguish between adjudicatory orders of certification and Board rules resolving certification issues. See Concurring Op. at 672-674. Certainly the APA invites no such distinction, providing generally for review of "agency action", 5 U.S.C. Sec. 702, subject of course to the explicit exceptions of Sec. 701. And while critics of Switchmen's have noted that the decision itself left open whether a court would affirmatively enforce a Board order without considering its legality, see Hart and Wechsler's The Federal Courts and the Federal System 409 (Paul M. Bator, et al. eds., 3d ed. 1988), I can see no basis for holding Switchmen's inapplicable to rules.[1] It is true, as Judge Randolph points out, that Switchmen's in part rested on an inferred congressional judgment against any "dragging out of the controversy into other tribunals of law", id., 320 U.S. at 305, 64 S.Ct. at 99, possibly arising out of congressional concern for quick dispatch of immediate representation controversies, but the Court's prime reliance was on the statutory structure. See id. at 305-06, 64 S.Ct. at 99-100. And in Railway Clerks the Court spoke of Congress's allocation of power between the Board and the judiciary in terms completely divorced from any immediate exigencies: "Congress has simply told the Board to investigate and has left to it the task of selecting the methods and procedures which it should employ in each case." 380 U.S. at 662, 85 S.Ct. at 1199.
 
 
 78
 Further, to the extent that the Switchmen's Court was influenced by perceptions of a congressional desire to resolve explosive problems quickly, that concern seems applicable here. The Merger Procedures attempt to deal efficiently with disputes before they escalate. Stonewalling by either side over rules of the game--sure to develop and be manifested as requests for stays of adjudications hinging on the outcome of judicial review of such rules--will undermine the dispatch evidently sought by Congress. Also, as pointed out by Airline Industrial Relations Conference and Regional Airline Association as amici:
 
 
 79
 [I]nvalidation of the merger procedures would likely place a cloud over the status of the certifications, voluntary recognitions, and revocation of certifications resulting in [previously decided applications], and could result in unnecessary litigation and disrupt the stable post-merger collective bargaining relationships now in place.
 
 
 80
 The destabilizing impact of the loss of the merger procedures would be even more significant in the future....
 
 
 81
 [Before the Merger Procedures, carrier decisions made without NMB clarification] frequently resulted in unresolved disputes, litigation and potential disruptions of airline operations.
 
 
 82
 Amicus Br. at 10-11.
 
 
 83
 Besides, the rule/adjudication distinction sets up perverse incentives for the Board, denying it the benefit of Switchmen's only when it gives widespread notice and opportunity to comment, and seeks to crystallize its views in a formal rule. After years of scholarly exhortations to agencies to make more use of rulemaking, because of that method's capacity to acquaint the agency with a wide range of viewpoints and to produce clear guidance for regulated parties,[2] it seems anomalous for this court to load the dice against NMB rulemaking. I see no basis for a rulemaking exception to Switchmen's.
 
 2. Jurisdictional Issues
 
 84
 The court alternatively addresses, although ultimately declines to rely on, Railway Labor's argument that the interpretive issue before us is "jurisdictional" and therefore is outside the constraints of Switchmen's/ Leedom. Maj.Op. at 663-64. In doing so it draws on a line of cases in our circuit granting review where the Board declines to exercise jurisdiction. See, e.g., Air Line Dispatchers Ass'n, 189 F.2d at 689. Finding the distinction between shortfalls and excesses of jurisdiction unsupportable, the court hints that it might extend the exception to any issue deemed jurisdictional.
 
 
 85
 I have no quarrel at all with the majority's rejection of the distinction between excesses and shortfalls of jurisdiction. But to review de novo any Board determination that the reviewing court classifies as jurisdictional is the wrong way out.[3] While courts commonly classify issues as relating to the "jurisdiction" of Article III courts, and make consequences turn on the classification, the categorization is typically self-evident because of language in the controlling documents, see, e.g., Art. III, Sec. 2 ("The judicial power shall extend to...."); 28 U.S.C. Sec. 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States"); 28 U.S.C. Sec. 1291 ("The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts...."). While Congress elsewhere in the Railway Labor Act expressly framed its mandate in jurisdictional terms, see 45 U.S.C. Sec. 155 First (entitled "Disputes within jurisdiction of Mediation Board"), the section here in dispute, Sec. 2 Ninth, uses no such label, and the majority offers no interpretive principles for identifying provisions as jurisdictional. Indeed, the majority acknowledges the hazards in making such classifications. See Maj.Op. at 664.
 
 
 86
 In the absence of a manageable line between jurisdictional and other issues, non-deference for "jurisdictional" issues is just a tag for the court's conclusion. "[T]here is no discernible line between an agency's exceeding its [jurisdictional] authority and an agency's exceeding authorized application of its authority. To exceed authorized application is to exceed authority." Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 381, 108 S.Ct. 2428, 2444, 101 L.Ed.2d 322 (1988) (Scalia J., concurring). See also Louis L. Jaffe, Judicial Control of Administrative Action 356-57 (1965). Thus, while appellants' brief seeks to distinguish between "cases concerning whether the NMB erroneously exercised its functions under Section 2 Ninth" and ones where "the issue is whether the NMB has the statutory authority to perform those functions at all", Opening Br. at 26, the purported dichotomy falsely assumes that an agency has "authority" to act erroneously in exercising its functions.
 
 
 87
 Presumably out of reluctance to use an undefinable category, the Supreme Court has not withheld Chevron deference in the face of claims that the issue was jurisdictional. See Reiter v. Cooper, --- U.S. ----, ----, 113 S.Ct. 1213, 1221, 122 L.Ed.2d 604 (1993) (applying Chevron to ICC's determination that statute did not grant it "initial jurisdiction ... with respect to the award of reparations"); Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 844-45, 106 S.Ct. 3245, 3253-54, 92 L.Ed.2d 675 (1986) (applying Chevron to scope of the Commission's jurisdiction over counterclaims); NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 830 n. 7, 104 S.Ct. 1505, 1510 n. 7, 79 L.Ed.2d 839 (1984) (pre-Chevron decision expressly rejecting proposition that a different level of deference guides review of "a jurisdictional or legal question concerning the coverage of" the National Labor Relations Act). Nor have we. See Railway Labor Executives' Ass'n v. United States, 987 F.2d 806, 813 (D.C.Cir.1993) (applying Chevron to issue whether provision of Interstate Commerce Act "is an independent source of authority" to modify collective bargaining agreements in a specific class of cases); Texas Utilities Electric Co. v. Federal Communications Commission, 997 F.2d 925 (D.C.Cir.1993). In Texas Utilities we upheld the FCC's authority, under a statute granting it power over "attachment by a cable television system" to utility poles, to regulate attachments for cables carrying nonvideo services, expressly formulating the issue as whether such cables fell "within the FCC's regulatory jurisdiction." Id. at 936. That issue seems no different in character from the question presented in Switchmen's itself--whether the NMB had the authority to divide a "craft or class".
 
 
 88
 Indeed, any issue may readily be characterized as jurisdictional merely by manipulating the level of generality at which it is framed. Thus, one could ask in Switchmen's whether the Board had authority to issue certifications dividing a "craft or class" into subsets based on the area in which specific members worked (which the Board had denied), cf. 320 U.S. at 309, 64 S.Ct. at 101 (Reed, J., dissenting), or one could ask whether the Board misapplied its authority by declining to make such divisions. Similarly, the issue here can be characterized as whether the Board had jurisdiction to investigate labor disputes within the railroad industry in the absence of a request by one of the parties, or as whether it misapplied its undoubted jurisdiction to investigate labor disputes in the industry. Such pliable labels should not control the scope of review.
 
 3. Application of Switchmen's/Leedom
 
 89
 It remains to apply the principles laid down in Switchmen's and qualified in Leedom. In Switchmen's the Court held the Board's certifications of labor representatives completely unreviewable--at least at the instance of a party seeking to set aside the certification (leaving open how courts should address efforts to invoke judicial equity powers to affirmatively enforce such a certificate, see 320 U.S. at 307, 64 S.Ct. at 100). As we have already seen, the issue of the meaning of "craft or class" could have been characterized as jurisdictional, and the Court expressly viewed it as a purely legal question, saying that the statute gave the Board the authority to interpret the words of the statute except in those instances where Congress had specifically called for judicial review. Id. at 305-06, 64 S.Ct. at 99-100. Largely from the presence of express provisions for judicial review, the Court concluded "if Congress had desired to implicate the federal judiciary and to place on the federal courts the burden of having the final say on any aspect of the problem [apart from those explicitly covered], it would have made its desire plain". Id. at 303, 64 S.Ct. at 98 (emphasis added). The Court later summarized Switchmen's as involving "a question of statutory construction" and as holding that "it was for the Board, not the Courts, finally to resolve such questions". Railway Clerks, 380 U.S. at 658-59, 85 S.Ct. at 1197.
 
 
 90
 The Switchmen's Court adopted this view in the face of a dissent starkly pointing out the hazards. Justice Reed observed that the Court had authorized the NMB to determine "the statutory limits of its own powers as well", Switchmen's, 320 U.S. at 321, 64 S.Ct. at 107 (Reed, J., dissenting), and that such a deferential rule "risk[ed] administrative action beyond or contrary to the legislative will", id. at 312, 64 S.Ct. at 103. Perhaps moved by such concerns, the Court in Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), created a narrow exception to prevent the Board from flouting a clear, nondiscretionary duty under the statute. At issue was an order of the National Labor Relations Board in certification proceedings under Sec. 9 of the NLRA. The statute stated "the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and [non-professional employees] unless a majority of such professional employees vote for inclusion in such unit". Id. at 185, 79 S.Ct. at 182. The NLRB conceded that "in commingling professional with nonprofessional employees ... it had acted in excess of its powers", id. at 187, 79 S.Ct. at 183, and the Court found judicial relief available. Evidently not regarding even conceded legal error as a sufficient ground for judicial interference, the Court emphasized that the Board order was "contrary to a specific prohibition in the Act", id. at 188, 79 S.Ct. at 184 (emphasis added) and was "an attempted exercise of power that had been specifically withheld ", id. at 189, 79 S.Ct. at 184. It stressed how patent a violation the Board had committed, describing the statutory provision at issue as "clear," "mandatory," and "definite". Id. at 188, 189, 79 S.Ct. at 184.
 
 
 91
 In this circuit we have used a number of formulae to characterize the power of review established by Leedom. We have, for example, read it to permit review only in instances of "gross violation of the statute". International Bhd. of Teamsters v. Brotherhood of Ry., Airline & S.S. Clerks, 402 F.2d 196, 205 (D.C.Cir.1968). And we have read the Switchmen's/ Leedom combination as mandating a form of judicial review that is "one of the narrowest known to the law". International Ass'n of Machinists v. TWA, 839 F.2d 809, 811, amended in technical part, 848 F.2d 232 (D.C.Cir.1988). A reviewing court may only "peek at the merits" and may interfere only if the peek reveals an error "as obvious on the face of the papers as the violation of specific statutory language". International Bhd. of Teamsters, 402 F.2d at 205. The insistence on specific statutory language accords with the Supreme Court's parallel statement inRailway Clerks that without a "specific requirement" in the Act itself, it is not sufficient to rely on "terms of policy and broad generalities as to what the Railway Labor Act should provide". 380 U.S. at 671, 85 S.Ct. at 1203.
 
 
 92
 Review under Switchmen's/ Leedom would appear to be at least as deferential to the agency as if review under Chevron stopped after the application of so-called "prong one". In that phase of review, we determine "whether Congress has directly spoken to the precise question at issue", Chevron, 467 U.S. at 842, 104 S.Ct. at 2781, or has "unambiguously expressed" its intent, id. at 843, 104 S.Ct. at 2781. If it has done so, the congressional intent of course controls despite what the agency may think. If Congress has been ambiguous on the issue, however, we go on to consider whether the agency's interpretation is a "reasonable" one, and uphold any such reasonable view, id. at 844, 104 S.Ct. at 2782, even though there may be another reasonable interpretation that we would adopt if resolving it de novo, id. at 843 n. 11, 104 S.Ct. at 2782 n. 11.
 
 
 93
 Unless an agency decision would flunk the first prong of the Chevron test, i.e., violate the "unambiguously expressed" intent of Congress, I do not see how it can be invalid under the emphatically restrictive form of review permitted by Leedom as an exception to Switchmen's.
 
 
 94
 * * *
 
 
 95
 A "peek at the merits" reveals no "clear" error in the Board's reading of the statute. The pertinent section is worded as follows:
 
 
 96
 If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier.
 
 
 97
 Railway Labor Act, Sec. 2 Ninth, 45 U.S.C. Sec. 152 Ninth (emphasis added).
 
 
 98
 The Board's Merger Procedures provide that railroad carriers that have merged "may invoke the Board's services for a determination of the post-merger status of any NMB certifications on the applicable properties." See Merger Procedures, 17 NMB at 54. They also allow the Board to act on its own initiative. See id. at 50-51. Investigation and certification--sorting out which union represents which employees when the employees dispute such matter--are incontestably what Sec. 2 Ninth authorizes the Board to do. "[S]o long as the Board is acting with the purpose of 'find[ing] the fact' as to who is the employees' representative, the courts are deprived of jurisdiction to review Board decisions." America West Airlines v. NMB, 986 F.2d 1252, 1256 (9th Cir.1993).
 
 
 99
 While the appellants argue that the Board is undertaking to resolve matters that are not representation disputes between unions, the Merger Procedures suggest nothing of the sort. The Procedures assert a power to investigate only whether the merged carriers will operate or are operating "as a single transportation system", Merger Procedures, 17 NMB at 51, which would necessitate a single representative for each "craft or class" within the system. See Alia Royal Jordanian Airlines/IBT, 10 NMB 389, 390 (1983); Seaboard System Railroad-Clinchfield Line, 11 NMB 217, 224 (1984) (citing the First Annual Report of the National Mediation Board (1935)). If two or more unions claim to represent the same craft or class, they would seem to be in dispute, both as the term is used in ordinary language and as it is used in Sec. 2 Ninth. Nothing in the Procedures asserts an intention to proceed in the absence of such a dispute, i.e., unless more than one union claims to represent a single craft or class, or (conceivably) workers in a single craft or class identify more than one union as their representative. The Procedures call explicitly for comments by incumbent representatives, 17 NMB at 54, who will presumably reveal their harmony when it exists. In the adjudication before us, the Burlington Northern case, where unions made conflicting representational claims, the Board resolved them and then stopped. Findings Upon Investigation, 18 NMB 240, 260 (1991). Thus the Procedures themselves and the application before us manifest an intent merely to resolve union or employee disputes as to who represents which employees and to certify the results.
 
 
 100
 While Sec. 2 Ninth imposes on the Board a specific duty to act under some circumstances (a request by a party), it says nothing "clear" or "explicit" or "specific" or "definite" about capacity to act when representation disputes within the railroad industry come to its attention by other means. The Board does not assert that carriers are "parties" entitled to "request" such investigation or certification; the Supreme Court in Railway Clerks previously upheld the Board's rejection of the carriers' claim of a statutory entitlement to participate as parties. 380 U.S. at 666-68, 85 S.Ct. at 1200-02. The Court held that the Act did not "require that [the carrier] be made a party to whatever procedure the Board uses to define the scope of the electorate", id. at 666, 85 S.Ct. at 1200 (emphasis added), but went on to say that "[w]hether and to what extent carriers will be permitted to present their views on craft or class questions is a matter that the Act leaves solely in the discretion of the Board", id. at 666-67, 85 S.Ct. at 1201. In the Merger Procedures the Board has sought to exercise that discretion.
 
 
 101
 The Court in Leedom stressed a principle behind the Switchmen's exception--the protection of specific rights granted in legislation. Leedom, 358 U.S. at 190-91, 79 S.Ct. at 184-85. Here, the employees have shown no specific "right" on which the Merger Procedures might be thought to encroach. Indeed, insofar as stultification of the agency will preserve multiple representation of workers in a single craft in a single system (as indeed it will), it will preserve violations of the system-wide representation rule adopted by the Board under Sec. 2 Fourth. See Seaboard, 11 NMB at 226-27. True, any employee has a right to request a Board investigation when a dispute among employees arises, and if the Board were to adopt procedures renouncing its duty to act upon these requests, reversal under Leedom review would appear appropriate. But nothing in the Merger Procedures strips employees of the specific right to invoke the Board; the Procedures merely grant the same right to others without impairing the employees' ability to request investigations.
 
 
 102
 Thus I agree in full with the majority's view that the reasoning of Leedom cannot be confined to "shall not" commands in the statute. Some agency refusals to act would violate a plain statutory duty or command, see Miami Newspaper Printing Pressmen's U. Local 46 v. McCulloch, 322 F.2d 993, 997 (D.C.Cir.1963) (refusals to certify election results may be reversible under Leedom ); cf. Air Line Dispatchers Ass'n, 189 F.2d at 689 (pre-Leedom case finding jurisdiction to review claim that Board inaction completely defeats statutory rights). But to apply Leedom to the present case disregards the admonition of General Committee of Adjustment v. Missouri-Kansas-Texas R.R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943), that "the command of the Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforcible in the courts should be implied". Id. at 337, 64 S.Ct. at 152-53 (emphasis added).
 
 
 103
 Further, I can imagine a "clear" or "plain" statutory violation even in a case where the statute does not literally spell out the command or prohibition violated. Judge Leventhal's phrase in International Bhd. of Teamsters--an "error ... as obvious as the violation of specific statutory language" was well chosen. Thus contextual elements--some powerful linguistic norm, an important substantive background assumption, legislative history of unusual clarity, or prior judicial interpretive authority--might be so convincing that the peek at the merits would disclose a violation. No such element is present here. The majority invokes two of these possibilities--the legislative history and a linguistic norm (the concept that the expression of one thing excludes alternatives not expressed). Neither suffices.
 
 
 104
 Before turning to legislative history and linguistic norms, I will briefly address the issue of past Board practice. It seems most improbable that this could ever seriously influence the outcome of review under Switchmen's/ Leedom, since even the more intrusive review under Chevron recognizes that agencies may alter their interpretations of the statutes they are charged to enforce without forfeiting the deference they are otherwise due. Chevron, 467 U.S. at 863, 104 S.Ct. at 2791. Thus, even reading previous Board pronouncements as disclaimers of the authority asserted here, see Maj.Op. at 669-670, would not affect the case. Further, there is no possible way the past practice can be read as completely disclaiming statutory authority to investigate and certify sua sponte. The Board has an established practice of sua sponte investigation where it discovers election fraud, see, e.g., International Bhd. of Teamsters, 402 F.2d 196, and, as mergers necessarily change the "systems" to which the Board's principle of systemwide representation applies, its action here vindicates a similar interest. There is simply no warrant for the majority's claim that such Board efforts to preserve the integrity of past certifications will undercut the neutrality necessary for its mediation functions under Sec. 5 First. Cf. Maj.Op. at 668-669.
 
 
 105
 The legislative history does indeed show that Congress was concerned with company unions and with employer interference with the choice of representation. See Maj.Op. at 668. But it is not at all clear why Board disentanglement of the impact of mergers on systemwide representation on its own initiative will tend to subject employees to such interference or control. The majority has not explained how employer requests interfere with the independent choice of employees to choose a preferred representative, except to imply that the carriers have absolute control over the timing of their requests and might choose to time their requests to disrupt (for example) one union's challenge to an incumbent. Maj.Op. at 668. But the assumption of power over timing is invalid. The Procedures require the merging carrier to "notify the NMB in writing at the same time it files with the Interstate Commerce Commission for approval of its intent to merge." 17 NMB at 50 (emphasis added). And while the Procedures do allow carriers to "invoke the Board's services" after the ICC filing is complete, 17 NMB at 53-54, this would only occur in cases where the Board has not acted in response to the carrier's initial filing.
 
 
 106
 The majority's reading of Sec. 2 Ninth sacrifices important purposes that Congress sought to achieve. As the Court in General Committee pointed out "[section 2, Ninth] was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a wide range of jurisdictional disputes between unions or between groups of employees", 320 U.S. at 336, 64 S.Ct. at 152, and that "[h]owever wide may be the range of jurisdictional disputes embraced within Sec. 2, Ninth, Congress did not select the courts to resolve them", id. The Board has identified merger situations as among those commonly producing disputes falling within that range, and its use of carriers to identify these disputes in their early stages is not "clearly" outside the Board's expressly granted Sec. 2 Ninth power to investigate and certify representatives in such instances.
 
 
 107
 Congress's rejection of the Eastman version of Sec. 2 Ninth (designating carriers as parties to the dispute and legally entitling them to request Board investigation), see Maj.Op. at 667, proves nothing about the Board's discretion to allow carriers to request Board intervention in specified circumstances. As Railway Clerks made clear, congressional refusal to order party status for carriers left "solely in the discretion of the Board" "[w]hether and to what extent carriers will be permitted to present their views on craft or class questions". 380 U.S. at 666-67, 85 S.Ct. at 1201. Had the Eastman bill passed, the Board would have been required to investigate at the behest of carriers and would have been investigating a different type of dispute--union-versus-carrier rather than union-versus-union. Congress's desire to prevent employer intrusion is not thwarted by the Board's adopting a policy of starting investigations when carriers bring to its attention specific circumstances that in its experience are likely to produce potentially disruptive representation disputes.
 
 
 108
 Finally, the majority reads too much into legislative silence when it implicitly relies on the proposition that congressional specification of one thing--a duty to investigate an employee request--negates the alternative. The first difficulty is that the majority slides over the question of just what alternative may be negated. While it is quite reasonable to read the provision for employee request as a "limiting condition" for the Board's duty to investigate, see Maj.Op. at 666-67, it is quite another to infer negation of Board authority to investigate in response to carrier notice of mergers. The Court adopted precisely that distinction in Railway Clerks in holding that the Board was under no duty to allow carrier participation but was entitled to allow it and define its scope.
 
 
 109
 Legislative silence may, of course, reflect either a legislative decision to leave the issue unresolved or a failure to focus on the issue sharply. Where the issue arises in administration of a statute that Congress has confided to an agency, Chevron tells us how to read such a gap--as a matter to be resolved by the agency. See 467 U.S. at 843-44, 104 S.Ct. at 2781-83; Texas Rural Legal Aid, Inc. v. Legal Servs. Corp., 940 F.2d 685, 694 (D.C.Cir.1991). See also Cheney R.R. v. ICC, 902 F.2d 66, 68-69 (D.C.Cir.1990), and cases cited therein. Not surprisingly, this court has at times deemed legislative silence an insufficiently clear indication of Congressional intent to warrant Chevron deference. Health Insurance Ass'n of America v. Shalala, 23 F.3d 412, 423 (1994); Central States Motor Freight Bureau, Inc. v. ICC, 924 F.2d 1099, 1104-06 (D.C.Cir.1991). In some contexts, of course, a negative inference will make sense, as in the statute hypothesized in Michigan Citizens for an Independent Press v. Thornburgh, 868 F.2d 1285, 1291-92 (D.C.Cir.1989), aff'd by an equally divided court, 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989): a ban on importation of apples, oranges and bananas clearly manifests an intent not to bar grapefruit. But nothing in the language or history of this statute makes the omission here the proper basis of such an inference.
 
 
 110
 Where the scope of judicial review is, as here, even more limited, use of such negative inferences is exceptionally unjustifiable. In Switchmen's/ Leedom review in the past we have rejected such an approach. In Professional Cabin Crew Ass'n v. NMB, 872 F.2d 456 (D.C.Cir.1989), we considered the Railway Labor Act's definition of "employee"--a "person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work," 45 U.S.C. Sec. 151 Fifth--and refused to infer from its reference to current activity any actual requirement of current work; rather we upheld the Board's decision that former strikers not presently working could vote. "[N]either section purports to speak exclusively." Id. at 460. We also refused to draw negative implications from the contrast in wording between the RLA and the NLRA. See id. at 461. In both this case and PCCA there is statutory language that states something affirmative; in both the issue is whether that affirmative implies a negative. Structurally, the issues are just the same. See also International Bhd. of Teamsters, 402 F.2d at 201-03 (recognizing Board's implied power to refuse to certify, or to decertify, representatives even though the statute authorized only identification and certification).
 
 
 111
 * * *
 
 
 112
 As the APA does not qualify the congressional preclusion of review of National Mediation Board decisions, and there is no principled way of singling out jurisdictional decisions for de novo review, I would apply the established principles of Switchmen's/ Leedom. As I can find no "clear and mandatory" barrier to the Board's efforts to assure that existing certifications do not turn into violations of the systemwide representation rule, I would uphold its decision and affirm the district court's dismissal of the actions.
 
 
 
 *
 The Court's amending order is published at 38 F.3d. 1224
 
 
 [1]
 The separate concurring opinion by Judge Randolph holds that judicial review also is available to the appellants under section 704 of the Administrative Procedure Act, see 5 U.S.C. Sec. 704 (1988), and that the Merger Procedures cannot withstand review for lack of authority in the Board to promulgate them. We agree with this alternative basis for decision
 
 
 [2]
 The Merger Procedures define "merger" broadly to include any "consolidation, merger, purchase, lease, operating contract, acquisition of control or similar transactions." Merger Procedures, 17 N.M.B. at 50
 
 
 [3]
 RLEA also brought a second suit in the District Court, challenging the Board's application of the Merger Procedures. In that case, the Board, at the request of Burlington Northern Railroad Co. ("Burlington"), had investigated the effect of various mergers and consolidations, mostly dating back to the 1970s, on employee representation certifications. The Board investigated over eighty certifications, issuing some new ones and terminating others. See In re Merger of Northern Pacific Ry., 18 N.M.B. 240 (1991). The District Court also dismissed this suit for want of authority to review the Board's actions. See Railway Labor Executives' Ass'n v. NMB, No. 91-1135, 1991 WL 190095 (D.D.C. Sept. 12, 1991) (order). The Burlington case was consolidated with this one on appeal before the panel as well as the en banc court
 
 
 [4]
 The cases cited by the Board do not establish a contrary proposition. They merely confirm that the judiciary takes a back seat when the Board decides matters that are "necessary incident[s]" of its right and duty to find the fact of representation. Railway Clerks, 380 U.S. at 669, 85 S.Ct. at 1202 (form of the election ballot); International Bhd. of Teamsters v. Brotherhood of Ry., Airline & S.S. Clerks, 402 F.2d 196, 202 (D.C.Cir.), cert. denied, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968) (balloting policy)
 
 
 [5]
 The dissent's argument that "jurisdictional questions" are entitled to deference is misplaced. In making this argument, the dissent conflates reviewability under Switchmen's and deference under Chevron. Were we to decide that all questions involving the Board's exercise of jurisdiction under Section 2, Ninth were reviewable, that would not answer the question whether the exercise were proper; and, in some cases, we might well defer to the Board's construction of the RLA. In this case, the reason no deference is warranted is because we find no ambiguity in Section 2, Ninth. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (courts should defer to an agency's reasonable statutory construction only when Congress has left a gap for the agency to fill)
 
 
 [6]
 We note that the Board itself relies on precisely the same sort of negative inference to argue that Congress "knew how to preclude authority that might otherwise be inferred." Brief for National Mediation Board at 39 n. 24. The Board's argument leads nowhere, however, in light of the text of the statute, the legislative history, and the principle that agencies act only pursuant to delegations of power that are explicit or can fairly be implied. See American Fin. Servs. Ass'n v. FTC, 767 F.2d 957, 965 (D.C.Cir.1985), cert. denied, 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986). The Board seems not to understand that "an agency's power is no greater than that delegated to it by Congress." Lyng v. Payne, 476 U.S. 926, 937, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986)
 
 
 [7]
 The House of Representatives ultimately passed H.R. 9861, a successor to H.R. 7650, which incorporated Section 2, Ninth as drafted by Commissioner Eastman and contained in H.R. 9689. Only H.R. 7650 contained a Section 2, Eighth that included carriers as parties to disputes
 
 
 [8]
 We are neither troubled nor persuaded by the Board's insistence that our "literal" reading of Section 2, Ninth would preclude unions from invoking the Board's jurisdiction, as has long been the practice. It is clear that in applying for investigation of a representation dispute, unions act only on behalf of employees, not as "parties" in their own right. See, e.g., 29 C.F.R. Sec. 1203.2 (1993) (written applications for investigation of representation disputes "should be accompanied by signed authorization cards from the employees composing the craft or class involved in the dispute")
 
 
 [9]
 In light of our conclusion that Section 2, Ninth permits only employees to invoke the Board's jurisdiction, we find it unnecessary to reach RLEA's additional contention that there is no "dispute" within the meaning of that section when the carrier or the Board initiates a Section 2, Ninth investigation
 
 
 [10]
 The second and third general purposes of the Act are "(2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; [and] (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter...." 45 U.S.C. Sec. 151a
 
 
 d
 I agree with the majority's decision to remand case number 91-5310 in light of our disposition of case number 91-5223
 
 
 [1]
 I am assuming for the sake of argument that the challenge here concerns a "rule" and not a policy statement, which would not bind the agency. See, e.g., Public Citizen, Inc. v. U.S. NRC, 940 F.2d 679, 682 (D.C.Cir.1991). While the Merger Procedures do oblige carriers to report mergers to the Board, they do not clearly bind the Board to investigate in any particular case. Merger Procedures, 17 NMB at 53-54 ("Carriers ... may invoke the Board's services for a determination of the post-merger status of any NMB certifications"); id. at 51 ("The Board's investigation shall take the form required by the circumstances"). As the logic of excepting rules from Switchmen's/Leedom is unclear, it is anyone's guess whether the exception would embrace a policy statement, which is often reviewable only at the time of application
 
 
 [2]
 Peter L. Strauss, The Rulemaking Continuum, 41 Duke L.J. 1463, 1482-83 (1992); Charles J. Morris, The NLRB in the Dog House--Can an Old Board Learn New Tricks, 24 San Diego L.Rev. 9, 27-42 & n. 80 (1987) (citing numerous articles treating the advantages of rulemaking); Richard K. Berg, Re-Examining Policy Procedures: The Choice Between Rulemaking and Adjudication, 38 Admin.L.Rev. 149, 163-64, 170 (1986); Robert W. Hamilton, Procedures for the Adoption of Rules of General Applicability: The Need for Procedural Innovation in Administrative Rulemaking, 60 Cal.L.Rev. 1276, 1313-15 (1972); but cf. Glen O. Robinson, The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform, 118 U.Pa.L.Rev. 485, 514-16 (1970). For similar arguments directed at state agencies, see Arthur Earl Bonfield, State Administrative Policy Formulation and the Choice of Lawmaking Methodology, 42 Admin.L.Rev. 121, 122-36 (1990)
 
 
 [3]
 The Board argues persuasively that in fact our prior reviews of non-exercises of jurisdiction can be justified as mere applications of Leedom